Bertram **LEWITUS**

v.

Fred **COLWELL**, J. Melvin Mackin and Merrall MacNealle, both in their official capacities as stewards of the Maryland Racing Commission and Individually; Frank Cucci, Donald S. Levinson, Robert W. Furtick, Carle A. Jackson, and J. Newton Brewer, both in their official capacities and as members of the Maryland Racing Commission and Individually; and Stephen H. Sachs, both in his official capacity as Attorney General of the State of Maryland and Individually.

Civ. No. HM77–1852.

United States District Court,
D. Maryland.

Oct. 26, 1979.

---

Phillip L. Felts, Bethesda, Md., John D. Jessep, Bridgeport, Conn., for plaintiff.

Stephen H. Sachs, Atty. Gen., Maryland, Asst. Attys. Gen. F. Todd Taylor, Jr. and Robert J. Aumiller, Baltimore, Md., for defendants.

HERBERT F. MURRAY, District Judge.

MEMORANDUM

The plaintiff, Bertram Lewitus, brought this action under 42 U.S.C. § 1983 against various officials of the Maryland Racing Commission (hereinafter "the Commission"), alleging that Code of Maryland Regulation 09.10.01.25.B (formerly Maryland Agency Rules, Department of Licensing and Regulation Number 09.10.24.02) (hereinafter "Regulation 25B") is unconstitutional either on its face or as applied to the plaintiff. The regulation in question sets out the standards for issuing a license to one who seeks to participate in horse racing in the state of Maryland:

B. The Commission may refuse to issue or renew a license or may suspend or revoke a license issued pursuant to this section if it finds that the applicant, or any person who is a partner, agent, employee, or associate of the applicant:

(1) Has been convicted of a crime in any jurisdiction;

(2) Is associating or consorting with any person or persons who have been convicted of a crime or crimes in any jurisdiction or jurisdictions;

(3) Is consorting or associating with or has consorted with, bookmakers, touts, or persons of similar pursuits, or has himself engaged in similar pursuits;

(4) Is financially irresponsible;

(5) Has been guilty of or attempted any fraud or misrepresentation in connection with racing, breeding or otherwise;

(6) Has violated or attempted to violate any law with respect to racing, in any jurisdiction or any rule or order of the Commission;

(7) Has violated any rule of racing which has been approved or adopted by the Commission; or

(8) Has been guilty of or engaged in similar related or like practices.

Mr. Lewitus, a Massachusetts resident, applied for a "thoroughbred owner's license" at the Laurel Race Course on November 8, 1976. He intended to race a horse named "Daisy Will," which had been shipped from Massachusetts a few days previously. In considering his application, the Commission was particularly concerned with Mr. Lewitus' association with a Mr. Patrick Catrone. Mr. Catrone had been listed as "Daisy Will's" trainer when the horse had run in Massachusetts on November 3, 1976. "Daisy Will" had been shipped to Maryland from Mr. Catrone's barn in Massachusetts. Mr. Lewitus traveled to Maryland with Mr. Catrone just before Mr. Lewitus applied for his license, and the two shared a motel room in Maryland for three days in early November.

At the time in question, Mr. Catrone had a substantial record of difficulties with racing officials in several states. He had been barred from many racetracks. There was evidence he had been involved in at least four instances of "ringing," an illegal practice by which the perpetrator alters an inferior horse's identification papers and runs a relatively superior horse as if it were the inferior one. The practice permits the perpetrator to bet large sums of money at odds made very favorable by the public's ignorance of the switch. Findings of Fact and Order of the Commission, April 13, 1977.

Although the Commission was thus concerned with Mr. Lewitus' association with Mr. Catrone, there was never any intimation that the plaintiff's own record was similarly blemished. Under the regulation being challenged here, specifically, subparagraph (3), the Commission could deny Mr. Lewitus a license if it found he was associating with one who engaged or had engaged in certain practices, regardless of whether the plaintiff himself had participated directly. The defendants have never contested Mr. Lewitus' assertions that his own racing record is clean.

After the plaintiff submitted his application on November 8, 1976, he appeared before the racing stewards on or about November 10 for questioning about his relationship with Mr. Catrone. He appeared before the stewards again on the 26th, when he was advised of Mr. Catrone's background and the applicability of Regulation 25B. At the plaintiff's request, the Commission held a hearing concerning his application on January 12, 1977. On April 13, 1977, the Commission issued an order denying Mr. Lewitus' application for an owner's license. The Plaintiff instituted this suit on November 8, 1977.

The defendants have moved for summary judgment, arguing that there are no genuine issues of material fact, and that the defendants are entitled to judgment as a matter of law. The court has given long and careful consideration to the arguments on both sides of the issue. The question is by no means an easy one. But having studied the facts and reviewed the applicable case law, the court has reached the conclusion that the defendants' motion for summary judgment must be granted.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must make two separate determinations before granting a motion for summary judgment. The first is whether the pleadings, discovery and affidavits show that there is no genuine issue of material fact. Federal Rules of Civil Procedure Rule 56(b); *Fli-Back Co., Inc. v. Philadelphia Manufacturers Mutual Insurance Co.,* 502 F.2d 214 (4th Cir. 1974); *John-*

*son v. McKee Baking Co.*, 398 F.Supp. 201 (W.D.Va.1975), *aff'd*, 532 F.2d 750 (4th Cir. 1976). In the case at bar, there is no dispute between the parties over the principal events surrounding Mr. Lewitus' application for a license and the Commission's refusal to grant it. The only "factual" issue the plaintiff can point to is the question whether the Commission has approved (or failed to revoke) licenses of certain individuals who have not met the standards of Regulation 25B.

█ In order to qualify as a genuine issue of material fact, a factual dispute must be one whose determination affects the outcome of the litigation. *Mutual Fund Investors, Inc. v. Putnam Management Co., Inc.*, 553 F.2d 620 (9th Cir. 1977); *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). As the Ninth Circuit stated in *McGuire v. Columbia Broadcasting System, Inc.*, 399 F.2d 902, 905 (9th Cir. 1968):

> [T]he showing of a 'genuine issue for trial' is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law. The question to be resolved is whether there is 'sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial.' [Quoting from *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).]

█ Viewing the matter in the light most favorable to the plaintiff, the court will assume *arguendo* that the facts are as he claims, and that certain individuals with questionable records hold Maryland racing licenses. Nevertheless, those facts do not conclusively establish that the Commission's exercise of its discretion under Regulation 25B denied the plaintiff any of his constitutional rights. As explained more fully in part III of this opinion, the mere fact that the regulation may result in some inequality does not necessarily prove a constitutional violation. The alleged factual issue is thus neither "material" nor "genuine," and cannot of itself preclude decision of the case by summary judgment.

The second determination a court must make before deciding a motion for summary judgment is whether the moving party is entitled to judgment as a matter of law. Rule 56(b); *Kotmair v. Gray*, 505 F.2d 744 (4th Cir. 1974). The plaintiff presents several legal theories in support of his claim. With respect to each of them, the defendants are entitled to prevail.

### I. Vagueness

█ The plaintiff argues that Regulation 25B is unconstitutionally vague, either on its face or as applied to him individually. The established test for vagueness in a statute is whether it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). That test, however, as well as the vagueness doctrine itself, applies primarily to criminal statutes. *Jordan v. DeGeorge*, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); *Mules v. Maryland Racing Commission*, 30 Md.App. 533, 353 A.2d 664 (1976). The standards applied to a law or regulation that imposes no criminal penalty, such as Regulation 25B, are somewhat less strict. If the language conveys sufficient warning about what is forbidden, it need not meet impossible standards of specificity. *Jordan v. DeGeorge, supra*, 341 U.S. at 231, 71 S.Ct. 703. The Supreme Court, recognizing that the English language limits the ability to be both specific and brief, has held that a statute is not unconstitutionally vague simply because it is unclear how the law might be applied in all possible circumstances. *United States Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

Viewed in that light, Regulation 25B is not unconstitutionally vague as applied to Mr. Lewitus. The term "associating with" has a commonly-understood meaning. The term "similar pursuits" is clarified by the specific nouns "bookmakers" and "touts" immediately preceding it in the regulation. The rule need not enumerate every conceivable prohibited activity in order to be constitutional. Even if the limits of the regulation are not clearly defined, the circumstances of Mr. Lewitus' case cannot be said to fall near the outer edges of the provisions: his relationship with Mr. Catrone is well within the common meaning of "associating," and ringing is clearly similar to touting in that it involves engaging in improper activities for betting purposes.* Because the regulation provides an adequate warning that conduct such as Mr. Lewitus' is prohibited, it is not unconstitutionally vague as applied to him. Given that conclusion, the plaintiff cannot be heard to argue that Regulation 25B might be unconstitutional as applied to others in different circumstances. *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Mules v. Maryland Racing Commission, supra,* 30 Md.App. at 549, 353 A.2d 664.

The latter rule does not apply when the statute at issue impinges on First Amendment freedoms. A plaintiff is not necessarily precluded from challenging such a statute merely because it does not adversely affect him individually. *NAACP v. Button,* 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). *See also Bigelow v. Virginia,* 421 U.S. 809, 815–16, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). The rationale is generally that a statute which affects First Amendment interests requires more exacting scrutiny than one which does not affect such interests. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). However, contrary to the plaintiff's contentions, Regulation 25B does not give rise to First Amendment issues.

## II. *First Amendment—Freedom of Association*

Mr. Lewitus maintains that Regulation 25B denies him his right freely to associate with whomever he chooses, specifically, Mr. Catrone, and that the denial violates the First Amendment. The freedom protected by the First Amendment, however, is the freedom to associate for the promotion of political and social ideas. *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). The amendment protects such association because it is so closely intertwined with the more fundamental rights of speech, assembly and petition. *See, e. g., Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Baird v. State Bar of Arizona,* 401 U.S. 1, 6, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Mr. Lewitus' association with Mr. Catrone was not politically or ideologically based; it was for the purpose of racing and purchasing horses, and probably for purely social purposes as well. Such an association, while unquestionably important, is not within the sphere of interests protected by the Constitution.

It is well established that a person cannot be punished merely because of his association with a particular group, if he does not participate in its illegal activities. *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). Mr. Lewitus extrapolates that point and argues that he cannot be punished merely because of his association with Mr. Catrone, as long as Mr. Lewitus himself was guilty of no misconduct. Again, the significant difference is that the statutes in *Robel* and *Scales* punished association with *political* groups. The statutes' common flaw was their impingement on the freedom to hold, share and promote ideas.

---

*\* Webster's Third New International Dictionary (1971) defines a "tout" as "one who secretly watches racehorses in training or gets racing information by improper means for betting purposes."*

Where no such political or ideological association is involved, several courts, including the Supreme Court, have concluded that First Amendment freedoms do not come into play. In *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the plaintiffs challenged a zoning ordinance which prohibited groups of more than two unrelated persons from living together in the same house. The Court summarily stated that the ordinance involved no "fundamental right," including the right of association. *Id.* at 7, 94 S.Ct. 1536. In considering a challenge to a similar ordinance, the court in *Palo Alto Tenants' Union v. Morgan*, 321 F.Supp. 908 (N.D.Cal.1970), *aff'd*, 487 F.2d 883 (9th Cir. 1973), said that to define "association" to include unrelated groups living together would dilute the effectiveness of First Amendment protections for more fundamental interests. *Id.* at 911–12. In *Eberhart v. Massell*, 311 F.Supp. 654 (N.D.Ga. 1970), the plaintiffs claimed a First Amendment right "to speak, and associate with, and visit in the homes of those they wish." The court rejected the argument as wholly insubstantial when directed against criminal ordinances prohibiting the frequenting of places where illegal liquor or drugs are kept, pointing out that freedom of association implies "a right to freedom of expression through associational affiliations," and a right to organize and join an association for the advancement of ideas, not to associate for purposes of illegal activity. *Id.* at 657–58. In *Berg v. Claytor*, 436 F.Supp. 76 (D.D.C.1977), *vacated on other grounds*, 192 U.S.App.D.C. 240, 591 F.2d 849 (D.C. Cir. 1978), Judge Gesell concluded that the Navy's discharge of a man because of his homosexual activities neither contravened the First Amendment nor placed any restriction on the plaintiff's right to associate with whomever he chose.

■ Mr. Lewitus' position and the right of association he claims are much more analogous to the cases just cited than to the cases in which the courts have found violations of the First Amendment. Because he has made no showing that Regulation 25B impinges on any rights protected by the amendment, the plaintiff's argument that the regulation is unconstitutional on First Amendment grounds must fail.

### III. *Due Process and Equal Protection*

■ The plaintiff argues that the application of Regulation 25B denied him his rights to due process of law and equal protection of the laws under the Fourteenth Amendment. Because Mr. Lewitus has no "fundamental right" to an owner's license, and because the discrimination he alleges was not directed toward a "suspect class," this court must analyze the equal protection claim under the "rational relationship" standard rather than the "strict scrutiny" standard. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). In other words, the inquiry must be whether the classifications Regulation 25B sets up are rationally related to a legitimate government interest. Similarly, under substantive due process analysis, the question is whether there is a rational nexus between the avowed purpose of Regulation 25B and the regulation's means of achieving that purpose. *West Coast Hotel v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

■ The court is satisfied that by the standard described, Regulation 25B does not violate the equal protection clause. The government interest at issue here is not only legitimate, but particularly important and sensitive as well:

> Horse racing is an endeavor and undertaking that necessarily must be the subject of intensive, extensive and minute regulation. *Greenfeld v. Md. Jockey Club*, 190 Md. 96, 104–105, 57 A.2d 335. It exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible, not only to sustain and profit the racing fraternity but to feed substantial, although by today's standards relatively few, millions to the

State's revenues. Not surprisingly the legislature has given the Commission full power to control racing. Code [1975 Repl. Vol.], Art. 78B, § 1, provides that the Commission "shall be vested with and possessed of the powers and duties in this article specified and also the powers necessary or proper to enable it to carry out fully and effectually all the purposes of this article." Section 11(a) says that the Commission "shall have full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland." This Court held in *Mahoney v. Byers*, 187 Md. 81, 84, 48 A.2d 600, 602, that the Commission "has power and authority to promulgate reasonable rules to govern the racing of horses. It may make such rules regulating the conduct of trainers, jockeys, owners, and generally regulate all matters pertaining to horse [races], in order that they may be conducted fairly, decently and [cleanly] but may not revoke a license except for cause."

*Jacobson v. Maryland Racing Commission*, 261 Md. 180, 183, 274 A.2d 102, 103 (1971). The nature and problems of racing are such that they not only permit but in fact require strict regulation. *Maryland Racing Commission v. McGee*, 212 Md. 69, 76, 128 A.2d 419 (1957).

In light of the Commission's broad powers to regulate horse racing, the classifications set up by Regulation 25B are not unreasonable, arbitrary or invidious. The plaintiff has made no showing of purposeful discrimination. *See Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). The regulation seeks to identify types of conduct that are likely to interfere with the goal of conducting horseracing fairly, decently and cleanly. As the defendants explained in their answers to interrogatories, the regulation as interpreted distinguishes between those who engage or have engaged in the prohibited conduct *in connection with racing*, and those who have engaged in it in some other context or not at all. The criteria for distinguishing between successful and unsuccessful license applicants are rationally related to the leg-islature's legitimate interest in the strict regulation of racing.

■ It is true that the regulation as applied to Mr. Lewitus seems somewhat irrational, given that he himself has done no wrong. However, the equal protection clause does not require that all classifications be drawn with absolute precision. "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), *quoting Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The Commission had a reasonable basis for believing that anyone who consorts or associates with bookmakers, touts, or others of similar pursuits would be likely to interfere with the scrupulous conduct of racing. The fact that the plaintiff may in fact pose no threat, or that other more threatening applicants are not excluded by Regulation 25B, does not of itself invalidate the regulation.

■ For many of the same reasons, Regulation 25B does not violate the principles of substantive due process. There is a rational nexus between the strictness of the rule and the avowed purposes behind the legislature's delegation of such broad regulatory powers to the Commission. The Commission's power to construe its own rules in a manner that disqualifies an applicant like Mr. Lewitus is compatible with the Commission's mandate to control all aspects of racing. *Mules v. Maryland Racing Commission, supra*, 30 Md.App. at 547, 353 A.2d 664. The regulation survives the minimal scrutiny to which this court must subject it, and did not deny the plaintiff any right to substantive due process.

■ Furthermore, there is no basis for a finding that Mr. Lewitus was denied any right to procedural due process. To begin with, it is unclear whether he was deprived of any liberty or property interest as the Supreme Court has defined those terms. A

"property interest" refers generally to "the security interests that a person has already acquired in specific benefits." *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Such an interest is more than an abstract desire for a benefit or a unilateral expectation of acquiring it. *Id.* at 577, 92 S.Ct. 2701. Rather, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). *See also Board of Curators v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

By that definition, Mr. Lewitus has never had a constitutionally protected property interest in a Maryland racehorse owner's license. No state law entitles him to one. He had not "already acquired" one when the Commission denied his application. At most, the plaintiff had an abstract desire for or unilateral expectation of receiving one. *See Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977).

Mr. Lewitus has a slightly more plausible argument that he may have been denied a constitutionally protected liberty interest. The essence of such an interest is the freedom from "a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth, supra,* 408 U.S. at 573–74, 92 S.Ct. at 2707. If the government action damages both an individual's reputation and a more tangible interest such as employment opportunities, the principles of procedural due process probably come into play. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Bishop v. Wood, supra,* 426 U.S. at 341, 96 S.Ct. 2074 (1976). Viewing the facts in the light most favorable to Mr. Lewitus, it may be that his circumstances fit the definition. Although there was no publication of the denial of his application, his reputation in the racing world has probably been damaged: once he has been barred from the Maryland racetracks, he becomes ineligible to obtain a license in other states as well. As long as that is true, the opportunity of earning all or part of his living racing horses is foreclosed to him.

Nevertheless, even if Mr. Lewitus were deprived of a constitutionally protected liberty interest, the inquiry does not end there. The Fourteenth Amendment does not guarantee that no such interest will ever be taken away. It provides only that there will be no deprivation without due process of law. "Due process" is a flexible term; the procedural safeguards to which an individual is entitled will depend on the circumstances of each particular case. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

In the court's opinion, Mr. Lewitus was afforded all the process due him under the Fourteenth Amendment. He had two separate opportunities, shortly after he submitted his application, to speak with the stewards and to hear their explanation of the problem with his application. He was given a full hearing, with ample notice, before the Commission in January of 1977. At that proceeding, the plaintiff was represented by counsel. There is no evidence that Mr. Lewitus was denied his basic rights to notice and a hearing.

The plaintiff cites authority for the proposition that implicit in the due process clause is the principle that guilt is personal, and that "legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber v. Aetna Casualty and Surety Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 1407, 31 L.Ed.2d 768 (1972). *See also Scales v. United States, supra,* 367 U.S. at 224–25, 81 S.Ct. 1469 (1961); *Tyson v. New York City Housing Authority,* 369 F.Supp. 513, 518–19 (S.D.N.Y.1974); *Randle v. Indianola Municipal Separate School District,* 373 F.Supp. 766 (N.D.Miss.1974). The last three cases cited were too closely involved with First Amendment freedoms to be directly analogous to the case at bar. However, the plaintiff's point is an important one. Regulation 25B forces him to suffer a genuine deprivation when he is personally guilty of no misconduct.

Although the court is not without sympathy for Mr. Lewitus' position, the court is satisfied that there has been no violation of any principle of the Fourteenth Amendment. Due process analysis is ultimately a task of balancing competing interests. *Wolff v. McDonnell*, 418 U.S. 539, 561, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bradford v. Weinstein*, 519 F.2d 728 (4th Cir. 1974), *vacated on other grounds*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). On the one hand, the plaintiff has an interest in racing his horses, in dealing with Mr. Catrone both socially and professionally, and in being free from punishment when he has done no wrong. On the other hand, the Maryland General Assembly, the people it represents, and the Maryland Racing Commission have an interest in assuring that legalized gambling in the state remains "as far above suspicion as possible." The Commission has stated that Mr. Lewitus is not permanently precluded from obtaining a license; he is invited to reapply once he has disassociated himself from Mr. Catrone in connection with racing.

On balance, the burdens imposed on Mr. Lewitus are outweighed by the broader concerns of the state. As the First Circuit Court of Appeals concluded in *Medina v. Rudman, supra,* 545 F.2d at 251: "Given the social evils associated with gambling and the state's revenue interests, the state's choice of means in the selection of licensees is entitled to prevail over the private interests of potential investors." The same conclusion is equally applicable to the private interests of potential owners and racers.

The court can find no persuasive evidence in the pleadings or discovery documents that the Commission has exercised its discretion arbitrarily or discriminatorily. On each of the legal theories raised by the plaintiff, the defendants are entitled to judgment as a matter of law. There is no genuine issue of material fact to be resolved.

Accordingly, for all the reasons stated in this memorandum opinion, the court will enter an order granting defendants' motion for summary judgment.